UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| DANNY WILCOX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:11-CV-32 CAN |
| | ) | |
| MICHAEL J. ASTRUE | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

On August 17, 2011, Plaintiff, Danny Wilcox ("Wilcox"), filed his complaint seeking review of the final decision of Defendant, Commissioner of Social Security ("Commissioner"). Wilcox filed his opening brief on August 17, 2011, and the Commissioner filed his response on November 25, 2011. Wilcox filed his reply brief on December 8, 2011. This Court now enters its ruling based on the consent of the parties and 28 U.S.C. § 636(c).

**I.   PROCEDURE**

On May 28, 2008, Wilcox filed his application for disability insurance benefits alleging a disability beginning on February 28, 2008. His application was initially denied on September 4, 2008. He applied for reconsideration, but was denied on October 31, 2008. Wilcox testified before an Administrative Law Judge ("ALJ") on February 11, 2010. On April 14, 2010, the ALJ issued his opinion denying Wilcox's application for disability benefits. Wilcox then filed his complaint in this Court pursuant to 42 U.S.C. § 405(g).

**II.   RELEVANT BACKGROUND**

Wilcox was born on April 16, 1957 and was 51 years old when the ALJ issued his decision (Tr. 222). He has an eighth grade education and can communicate in English (Tr. 239,

245). He has past relevant work experience as a press operator, warehouse worker, machine operator, loader and unloader, and as an auto detailer (Tr. 280-281).

### A. Medical Evidence

In January 2001, Wilcox had a neurosurgical examination (Tr. 312). The physician's examination showed marked tenderness of the lower back, limited range of motion in the lumbar spine, and positive straight leg raising tests[1] (Tr. 313). An MRI of Wilcox's lower back showed L5-S1 central disc protrusion with a compressed spinal nerve. *Id*. The physician discussed treatment options with Wilcox, but Wilcox chose to continue with conservative treatment (Tr. 314). The physician arranged for Wilcox to try physical therapy with an emphasis on lower back strengthening exercises. *Id.*

In April 2003, Wilcox was examined by an orthopedic surgeon because of his elbow and forearm pain complaints, as well as numbness in his fourth and fifth fingers on his right hand (Tr. 285). Upon examination, Wilcox had full range of motion of the spine, but had mild tenderness in the right elbow. *Id*. A test revealed palsy of the nerve crossing his right elbow. *Id*. The surgeon recommended that Wilcox use towel splints at night in order to gain some relief (Tr. 286).

In July 2006, Dr. Giacomini, Wilcox's treating physician, noted that Wilcox had not taken his blood pressure medication since he ran out four to five months earlier (Tr. 294). He recommended that Wilcox start taking his blood pressure medication. *Id*. In March 2007, Dr. Giacomini again noted that Wilcox had not taken his blood pressure medication in over a month

---

[1] A straight leg raise test is used to determine whether a patient with lower back pain has an underlying herniated disc. Kerry H. Levin, *Low Back Pain*, DISEASE MGMT. PROJECT, Jan. 1, 2009, http://www.clevelandclinicmeded.com/medicalpubs/diseasemanagement/neurology/low-back-pain/#bib6.

(Tr. 293). He told Wilcox that he could come to the office for medication samples, but Wilcox never came. *Id*. In January 2008, Wilcox went to Dr. Giacomini with back pain caused by dragging a deer out of the woods (Tr. 292). His pain had lightened up, and his blood pressure was under control. *Id*.

In June 2008, Wilcox underwent a psychological evaluation at the request of the Disability Determination Bureau (Tr. 322). His symptoms included depressed mood, diminished energy, difficulty concentrating, feelings of worthlessness, and frequent thoughts of death. *Id*. During his interview there were several instances of apparent pain resulting from his back spasms. *Id*. Wilcox said that he did not cook, clean, shop for groceries, or do laundry because his wife performed those activities. *Id*. He was able to manage his own hygiene. *Id*. He stated that his typical day consisted of waking up at 7:00 a.m., but staying in bed until 11:00 a.m. watching television. *Id*. He then fed his dogs and tinkered most of the day by assembling model kits. *Id*. He also watched little league baseball in the evenings. *Id*. The psychologist noted that Wilcox's gate and posture were normal, and that his eye contact and speech quality were good (Tr. 324). Additionally, the psychologist noted that Wilcox's "ability to understand and interpret abstract information was good (Tr. 25)." Wilcox was diagnosed with a depressive disorder and was assigned a Global Assessment Functioning ("GAF") score of $60^2$. *Id*.

In July 2008, Wilcox went to see a physician, complaining of chronic lower back pain, elbow tendinitis, and carpal tunnel syndrome (Tr. 329). The physician observed that Wilcox's gait was slow, but sustainable, and that he was able to squat with some difficulty and perform

---

[2] GAF scores represent on a single day an individual's overall level of functioning, including symptom severity. The GAF numeric scale runs from 0 through 100. The higher the GAF score, the less severe the symptoms and the individual will have a higher level of functioning. *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32-34 (4th ed. 2000)(DSM-IV).

tandem walk (Tr. 331). His hand movement function was normal. *Id*. The physician's impressions were chronic lower back pain, elbow tendinitis, carpal tunnel syndrome, a history of a learning disability, and a history of left eye vision loss. *Id*.

In August 2008, a state agency reviewing psychologist believed that Wilcox did not have a severe mental impairment (Tr. 333). The psychologist opined that Wilcox only had mild restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace (Tr. 343). In September 2008, a state agency reviewing physician believed that Wilcox could lift and/or carry 50 pounds occasionally, 25 pounds frequently, and stand and/or walk about six hours in an eight hour workday (Tr. 356).

On September 5, 2008, Wilcox went to Dr. Giacomini because of his high blood pressure and a strain in the groin area (Tr. 371). Wilcox had stopped taking his blood pressure medication at that time, but was told to start taking it again. *Id*. Later examinations showed that his blood pressure was under control once he started taking his medication (Tr. 370).

### B.     ALJ Hearing on February 11, 2010

#### 1.     Wilcox's Testimony

Wilcox testified at the ALJ hearing that he was disabled due to tendinitis in both arms, three disintegrated discs in his back, depression, and poor vision in his left eye (Tr. 92-93). He explained that his back pain is just a dull, throbbing pain, but can turn into painful spasms (Tr. 93). Because of this, he had to change positions often (Tr. 94). To relieve his pain, he took a pain medication and used a heating pad with a vibrator (Tr. 96-97). Wilcox also testified about the pain and swelling in his elbows, which caused his hands to go numb and made him unable to move his arms or hands (Tr. 93).

Wilcox testified that he could walk only one block before having breathing difficulty and back pain (Tr. 105). Further, he said that he could only stand for five minutes before having to sit down, and he could only sit for ten minutes before having to stand (Tr. 106). Wilcox stated he could not lift anything weighing more than twenty pounds, and that he had difficulty picking up small objects due to hand swelling (Tr. 107).

### 2. Vocational Expert Testimony

The ALJ asked the vocational expert what types of jobs could be performed by an individual with Wilcox's age, education, and work history (Tr. 131). Specifically, this individual could sit, stand, and walk for six hours in an eight hour workday; lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; occasionally push and pull hand controls; no climbing of ladders, ropes, or scaffolds; no constant use of the hands; and no exposure to bright lights. *Id*. Further, the individual was limited to work that would accommodate monocular vision and did not involve depth perception. *Id*. Mentally, the hypothetical individual was limited to unskilled work that involved understanding, remembering, and carrying out simple, routine tasks; no fast-paced production work; only occasional interactions with others; and no jobs where reading, spelling, and math calculations would be an essential part of the job. *Id*.

The vocational expert stated that these limitations would eliminate all of Wilcox's past relevant work experience (Tr. 132). However, the jobs of laundry folder, palletizer, and garment bagger met the requirements of the hypothetical. *Id*.

### 3. ALJ Determination

On April 14, 2010, the ALJ found the Wilcox was not disabled (Tr. 27). Although

5

Wilcox was unable to perform any past relevant work, the ALJ found that he had the residual functional capacity ("RFC") to perform light work (Tr. 19).

## III. Analysis

### A. Standard of Review

The standard of review for an ALJ's decision is whether it is supported by substantial evidence and free of legal error. *See* 42 U.S.C § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Golembiewski v. Barnhardt*, 322 F.3d 912, 915 (7th Cir. 2003). However, an ALJ's legal conclusions are reviewed *de novo*. *Haynes*, 416 F.3d at 626. Substantial evidence is more than a scintilla and means such relevant evidence as a reasonable mind might accept to support such a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1972). A reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes*, 416 F.3d at 626. An ALJ decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

### B. Wilcox's Motion for Remand

Wilcox must establish that he is disabled to be entitled to benefits under the Social Security Act. *See* 42 U.S.C. § 423(a)(1)(D). The Act specifically defines "disability" as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. The ALJ must consider whether: (1) the

claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920; *Briscoe*, 425 F.3d at 352. If the ALJ can find that the claimant is not disabled at any step, he does not go on to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

An impairment or combination of impairments is considered severe if the applicant's physical or mental ability to perform basic work activities is significantly limited. 20 C.F.R. § 404.1521(a). The combination of impairments is taken into account, even if each individual impairment would not be considered severe. 20 C.F.R. § 404.1523. If the applicant does not meet this requirement, then the applicant is not disabled. 20 C.F.R. § 404.1520(c). In order to be considered severe, the impairment must either cause the applicant's death, or has lasted or is expected to last for a continuous period of at least 12 months. 20 C.F.R. § 404.1509. When assessing the severity of an impairment, the applicant's age, education, and work experience are not considered. *Id.* However, it is still possible for the applicant to have been disabled for a period of time in the past even if the applicant currently does not have a severe impairment. *Id.*

If the applicant's impairment or combination of impairments meets the requirements outlined in Subpart P, Appendix 1 and also meets the duration requirement, then the applicant is disabled without considering the applicant's age, work experience, or education. 20 C.F.R. § 404.1520(d). Once the ALJ finds that the applicant is not disabled after the first three steps, then

the ALJ assesses the RFC. 20 C.F.R. § 404.1520(e). The RFC is the applicant's ability to do physical and mental work activities on a sustained basis despite limitations. *Id.* Once the RFC is determined, it is compared to the applicant's past relevant work to see if the applicant could still perform that type of work. 20 C.F.R. § 404.1520(f). If the applicant could still perform past relevant work, then the applicant is not disabled. *Id.* Past relevant work includes any substantial work performed within the last 15 years. 20 C.F.R. § 404.1560(b)(1). The applicant has the burden to prove the first four steps, but upon reaching step five, the burden shifts to the Commissioner. 20 C.F.R. § 404.1520(e).

First, the Court must consider whether the ALJ erred by not ordering additional medical examinations. Next, the Court must decide whether the ALJ's credibility finding was reasonable. Finally, the Court must consider whether the ALJ's Step Five determination was supported by substantial evidence.

### 1. The ALJ did not err by not ordering additional medical examinations.

Wilcox contends that the ALJ erred by not ordering additional medical examinations. Specifically, Wilcox alleges that the ALJ should have ordered IQ testing and an additional MRI of his back to rule out mental retardation and additional back issues. The ALJ has a basic duty to develop a full and fair record, but "the claimant bears the burden of submitting medical evidence establishing [his] impairments and [his] residual functional capacity. *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011), 20 C.F.R. § 404.1512(c). An ALJ is not required to order additional examinations, but may do so if the medical evidence of record is insufficient. *See* 20 C.F.R. 416.912(f). "Because it is always possible to identify one more test or examination an ALJ might have sought, the ALJ's reasoned judgment of how much evidence to gather should

generally be respected." *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004).

First, in regards to Wilcox's mental condition, the ALJ cited his ability to perform substantial gainful work activity at different employers for several years (Tr. 24). While Wilcox's testimony stated that he needed frequent help in doing his past jobs, "nothing in the record suggested any major cognitive mental limits to the extent of having mental retardation intelligence levels that required supported or accommodated work." *Id*. None of the medical records stated that mental retardation was a possible diagnosis, and, notably, the state psychologist said that Wilcox's ability to understand and interpret abstract information was good (Tr. 325). Wilcox's own testimony stated that his past employment terminations arose from disagreements with supervisors rather than low intellectual functioning, and that he sometimes read books for leisure, was able to follow recipes, and balancing a checkbook was not too difficult for him (Tr. 91-92, 116, 124). In brief, Wilcox not only failed to introduce any evidence demonstrating that he was mentally retarded, he failed to even allege that he had mental limitations that reduced his ability to perform work activities.

Next, the ALJ did not err by not ordering an additional MRI of Wilcox's back. Wilcox argues that since his last MRI was in 2000, the ALJ should have ordered an additional test to determine if his condition had worsened. In his testimony at the ALJ hearing, Wilcox alleged that his back condition had worsened (Tr. 119-120). However, Wilcox failed to present any evidence that indicates that such a worsening had taken place. Given this, the ALJ did not err by declining to order an additional MRI.

Therefore, this Court finds that the ALJ did not err by not ordering additional medical examinations.

### 2. The ALJ's credibility finding was reasonable.

Wilcox further contends that the ALJ's decision was not based upon substantial evidence. Wilcox primarily takes issue with how the ALJ discounted his subjective allegations about the intensity, persistence, and limiting effects of his symptoms. Because an ALJ is in a special position where he can hear, see, and assess witnesses, an ALJ's credibility determinations are given special deference; and, as a result, an ALJ's credibility determinations will only be overturned if they are patently wrong. *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).

The ALJ considered Wilcox's physical complaints when making his decision. He noted Wilcox's back and elbow pain, as well as the swelling in his arms and fingers (Tr. 20). He also noted Wilcox's vision problems, asthma, his activities on a typical day, and his difficulties reading and writing (Tr. 21). However, the ALJ found that Wilcox's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible because of his medical records and actions at the hearing. *Id*.

The ALJ noted that the only ongoing treatment Wilcox received was for his blood pressure. *Id*. Wilcox did not consistently take his medication even though his physician gave him free samples, and his blood pressure was under control once he started taking his medication. *Id*. Surgery was recommended for Wilcox's back pain, but he chose a more conservative treatment because he was scared of doctors and hospitals (Tr. 20). Further, at the hearing, Wilcox did not appear to have any obvious standing or walking problems (Tr. 23). He walked in rapidly, remained seated during the entire one hour hearing, and drove himself 50 miles to the hearing without stopping. *Id*. Therefore, because the ALJ's credibility determination did not lack sufficient explanation, it was not patently wrong.

### 3. The ALJ's Step Five determination was supported by substantial evidence.

Wilcox argues that the ALJ failed to include all of his functional limitations into the hypothetical question to the vocational expert. "The ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007). As discussed above, the ALJ found that Wilcox's testimony was not credible; therefore, the ALJ was not required to incorporate those limitations into his hypothetical question.

Next, Wilcox contends that the vocational expert's responses were inconsistent with the Dictionary of Occupational Titles ("DOT"). "The ALJ has an affirmative responsibility to ask if the [vocational expert's] testimony conflicts with the DOT, and if there is an apparent conflict, the ALJ must obtain a reasonable explanation. *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009). However, it is the claimant's burden to prove that the apparent conflict was "obvious enough that the ALJ should have picked up on [it] without any assistance." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008).

Wilcox states that the vocational expert's statements that he could perform the jobs of bagger of garments, folder, or palletizer require math, reading, and spelling skills that are inconsistent with his abilities. Common sense does not dictate that these skills are an essential part of these jobs. This Court finds that since this was not so obvious that the ALJ should have picked up on it, the ALJ did not err by not obtaining a reasonable explanation.

Finally, Wilcox argues that the vocational expert's testimony involving an individual who could not perform jobs that involved exposure to pulmonary irritants was inconsistent with the DOT description of the identified jobs. The DOT indicates that these jobs do not involve any

exposure to atmospheric conditions such as pulmonary irritants. DOT §§ 369.687-018, 920.687-018, 929.687-054. Thus, this Court finds that the vocational expert's testimony was not inconsistent with the DOT job descriptions.

## III. CONCLUSION

Because the ALJ did not err by not ordering further medical examinations, his credibility determination was reasonable, and his Step Five determination was supported by substantial evidence, Wilcox's motion for remand is **DENIED**. Accordingly, this Court **AFFIRMS** the ALJ's decision.

**SO ORDERED**

Dated this 8th day of February, 2012.

s/Christopher A. Nuechterlein  
Christopher A. Nuechterlein  
United States Magistrate Judge